IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DARLENE SULLIVAN,                    )
                                     )
            Plaintiff,               )
                                     )
        v.                           )   C.A. No. 18-803 (MN)
                                     )
HANOVER FOODS CORP.,                 )
                                     )
            Defendant.               )

## <u>**MEMORANDUM OPINION**</u>

Seth J. Reidenberg, TYBOUT, REDFEARN, & PELL, Wilmington, DE, Evan L. Frank, ALAN L. FRANK LAW ASSOCIATES, P.C., Jenkintown, PA – attorneys for Plaintiff.

Barry M. Willoughby, Timothy Jay Houseal, Curtis J. Crowther, Lauren E.M. Russell, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, DE – attorneys for Defendant.

January 14, 2020
Wilmington, Delaware

NOREIKA, U.S. DISTRICT JUDGE

On May 29, 2018, Plaintiff Darlene Sullivan ("Plaintiff") filed a complaint against Defendant Hanover Foods Corporation ("Defendant") alleging violations of Title VII of the 1964 Civil Rights Act ("Title VII") and the Delaware Discrimination in Employment Act ("the DDEA"). (D.I. 1). Plaintiff later added claims under the Family and Medical Leave Act ("the FMLA"). (D.I. 57, 61, 62).[1] Pending before the Court is Defendant's motion for summary judgment ("Motion"). (D.I. 64). For the reasons set forth below, Defendant's Motion is GRANTED-IN-PART and DENIED-IN-PART.

## I.    BACKGROUND

This case stems from a series of disputes between an employee and her employer. From June 2014 until December 28, 2017, Plaintiff – with two gaps – was an employee at Defendant's production facility in Clayton, Delaware ("Clayton Plant"). (D.I. 62 ¶ 1; D.I. 74 at 1 ¶ 1). Initially hired as a vegetable production worker, Plaintiff held a variety of positions over the next three and a half years. (D.I. 62 ¶ 1-6; D.I. 74 at 1 ¶¶ 1-6). She was laid off twice but re-hired in both instances. (D.I. 62 ¶¶ 1-6; D.I. 74 at 1 ¶¶ 1-6).

Plaintiff is an African American woman. During her years of employment at the Clayton Plant, Plaintiff complained repeatedly of sexual, racial, and retaliatory discrimination and harassment. (D.I. 74 at 7 ¶¶ 1, 6-8; D.I. 77 ¶¶ 1, 6-8). She lodged these complaints with a number of individuals and entities, including: Defendant's CEO, Jeffrey Warehime; her H.R. representative; the Equal Employment Opportunity Commission ("EEOC"); and the Delaware Department of Labor ("DDOL"). (*Id.*). Three times, she submitted Charges of Discrimination

---

[1]    The Court's referral to "Complaint" herein is to Plaintiff's most recent Amended Complaint, (D.I. 62).

jointly to the EEOC and the DDOL, the first and third of which – those filed on January 14, 2016

("January 2016 Charge") and April 20, 2017 ("April 2017 Charge") – are relevant here. (*Id.* ¶ 8).

In those instances, the EEOC, acting on the recommendation of the DDOL, determined that "the

evidence [did] not support a legal conclusion that illegal discrimination occurred." (D.I. 67 at

A59, A76-77).

On November 21, 2017, Plaintiff was placed on FMLA leave after reporting an overuse

injury to her hand. (D.I. 66 ¶¶40-44). Her physician estimated that her condition would last "8-

12 weeks," stated that she was "to remain out of work until re-evaluated in four (4) weeks" and

noted that reevaluation would take place on December 19, 2017. (*E.g.*, D.I. 67 at A63; *see also*

A64-73). What occurred after that date – December 19, 2017 – and whether it was intended to be

the end of Plaintiff's FMLA leave, is disputed by the parties. Plaintiff, in short, asserts that

December 19, 2017 was the date on which she would be re-evaluated, that she saw her physician

as scheduled, that she was informed that she would need to remain out of work, and that she

provided Defendant notice of that fact shortly thereafter but was nevertheless considered absent

without cause and terminated. (D.I. 71 at 18-23). Defendant, on the other hand, contends that

Plaintiff's FMLA leave ended on December 19, 2017, it received no notice that she remained

unable to work beyond that date, and it terminated her employment on December 28, 2017 after

she failed to report to work at the Clayton Plant for several days without excuse. (*See* D.I. 65 at

20-25; D.I. 76 at 10-15).

In eventual response to her termination, Plaintiff filed the present suit, in which she alleges

violations of Title VII, the DDEA, and the FMLA. (D.I. 62). Specifically, she asserts that

Defendant violated Title VII and the DDEA by: "engag[ing] in a pattern and practice of

discrimination against [her] with respect to the terms, conditions, and privileges of employment

because of her race and [sex], and in retaliation for her complaints and discrimination charges";
"subject[ing her] to dissimilar and disparate standards of treatment with respect to the terms,
conditions, discipline, and privileges of employment, because of her race and [sex]"; and
"creat[ing] a working environment so hostile that no reasonable employee would tolerate it."[2] (*Id.*
¶¶ 59-78).  Also included is an allegation that Defendant terminated Plaintiff's employment in
retaliation for her discrimination complaints.  (*Id.* ¶¶ 64, 74).  Additionally, Plaintiff alleges that
Defendant violated the FMLA by interfering with her rights under that statute and retaliating
against her for invoking those rights.  (*Id.* ¶¶ 79-86).

In its Motion, Defendant seeks summary judgment on nearly all of Plaintiff's Title VII and
DDEA claims, and both of her FMLA claims.  (*See* D.I. 65; D.I. 76).

## II. <u>LEGAL STANDARD</u>

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant
summary judgment if the movant shows that there is no genuine dispute as to any material fact and
the movant is entitled to judgment as a matter of law."  A factual dispute is genuine where "the
evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson
v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the burden of
demonstrating the absence of a genuine issue of material fact.  *See Matsushita Elec. Indus. Co. v.
Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *Aman v. Cort Furniture Rental Corp.,* 85 F.3d
1074, 1080–81 (3d Cir. 1996).  An assertion that a fact is or is not genuinely disputed must be

---

[2]     Plaintiff asserts claims for "gender" discrimination; however, neither Title VII nor the
DDEA prohibits discrimination on the basis of "gender" – Title VII prohibits
discrimination, *inter alia*, on the basis of "sex," *see* 42 U.S.C. § 2000e-2, and the DDEA
prohibits discrimination, *inter alia*, on the basis of "sex" and "gender identity," *see* 19 *Del.
C.* § 711(a).  In light of this and because Plaintiff's explanation of her claims indicates they
are consistent with traditional "sex" discrimination claims, the Court considers and refers
to them as such.

supported either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B). Relevant to this dispute, EEOC charges may raise genuine issues of material fact on their own. *See Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 168 (3d Cir. 2013) (citing *Liotta v. Nat'l Forge Co.*, 629 F.2d 903, 907 (3d Cir. 1980)).

If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 475 U.S. at 587. The Court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000), but must only ask "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented," *Anderson*, 477 U.S. at 248.

In an employment discrimination case, like this one, the Court must ascertain "whether . . . there exists sufficient evidence to create a genuine issue of material fact as to whether the employer intentionally discriminated against the plaintiff." *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987); *see also Larochelle v. Wilmac Corp.*, 210 F. Supp. 3d 658, 676 (E.D. Pa. Sep. 27, 2016). "Conclusory allegations," however, "in the absence of particulars, are insufficient to defeat summary judgment." *Taylor v. Cherry Hill Bd. of Educ.*, 85 F. App'x 836, 839 (3d Cir. 2004). Moreover, where, as here, "the nonmoving party bears the burden of proof at trial, the moving party is entitled to summary judgment on showing that there is a lack of evidence to carry the non-moving party's burden on an essential element of that party's cause of action." *Brooks v. CBS*

*Radio, Inc.*, 342 F. App'x 771, 775 (3d Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

## III. <u>DISCUSSION</u>

As an initial matter, the Court must address Defendant's argument that the "DDEA includes the same administrative exhaustion requirements as" and "is construed *in pari materia* with Title VII." (D.I. 65 at 12, n.10). Plaintiff does not contest this point and the law aligns with Defendant's position. *See Hyland v. Smyrna Sch. Dist.*, 608 F. App'x 79, 83 n.5 (3d Cir. 2015) (instructing that "the standards under Title VII and the DDEA are generally the same, [therefore a plaintiff's] inability to survive summary judgment under Title VII dooms her claim under the DDEA"); *see also Fort Bend Cnty., Texas v. Davis*, 139 S.Ct. 1843, 1846 (2019) ("As a precondition to the commencement of a Title VII action in court, a complainant must first file a charge with the [EEOC]." (citing 42 U.S.C. § 2000e-5(e)(1), (f)(1)); *Paitsel v. State*, No. K15C-02-030 JJC, 2016 WL 1424828, at *4 (Del. Super. Ct. Apr. 7, 2016) ("A charging party may file a civil action for discrimination in the Superior Court only after exhausting all administrative remedies and receiving a Delaware or Federal Right to Sue Notice." (citing 19 *Del. C.* § 711(a))). Moreover, Plaintiff's Title VII and DDEA claims are substantively identical and the parties address them jointly in their filings. (*See* D.I. 65; D.I. 71; D.I. 76). Thus, the Court applies the same administrative requirements to both sets of claims and analyzes them jointly.[3]

---

[3]     The law is unsettled as to whether a plaintiff may proceed with the same claims under both federal (*e.g.*, Title VII) and state (*e.g.*, DDEA) law. *Compare Brangman v. AstraZeneca, LP*, 952 F. Supp. 2d 710, 724 (E.D. Pa. 2013) (concluding 19 *Del. C.* § 714(c) does not bar plaintiff from bringing both Title VII and DDEA claims in federal court), *with Daughtry v. Family Dollar Stores, Inc.*, 634 F. Supp. 2d 475, 483 n.13 (D. Del. 2009) (concluding 19 *Del. C.* § 714(c) precludes plaintiff from pursuing relief under both Title VII and DDEA). Given the unsettled nature of the law, the Court considers Plaintiff's discrimination claims under both statutory schemes. *See Banner v. Dep't of Health &*

## A.    Title VII and the DDEA

Title VII states that "[i]t shall be an unlawful employment practice for an employer to . . . discharge any individuals, or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  Similarly, the DDEA outlaws discrimination by an employer on the basis of race and/or sex.  19 *Del. C.* § 711(a).

In seeking summary judgment on Plaintiff's Title VII and DDEA claims, Defendant argues that Plaintiff's: (1) wrongful termination claims should be "dismissed"[4] for failure to exhaust her administrative remedies, and her (2) retaliation claims, (3) discrimination and disparate treatment claims based on race and sex, (4) and hostile work environment claims based on race and sex should be "dismissed" because of evidentiary deficiencies.  (*See* D.I. 65 at 1-2; D.I. 76 at 3, 6-9).

### 1.    Wrongful Termination Claims[5]

First, Defendant asserts that Plaintiff's Title VII and DDEA wrongful termination claims must be dismissed because complainants are required to submit such charges to the EEOC prior to filing suit and Plaintiff "never filed a charge of discrimination with the DDOL or EEOC alleging that her termination constituted retaliation."  (D.I. 65 at 11).  Plaintiff does not disagree that she is required to have submitted her complaints to the EEOC, but counters that her January 2016 and

---

*Human Res. Div. for the Visually Impaired*, No 12-1625-LPS, 2018 WL 1377095, at *4 n.4 (D. Del. March 19, 2018) (reaching the same conclusion and taking the same approach).

[4]    Defendant repeatedly requests that Plaintiff's claims be "dismissed."  Defendant's motion, however, is one seeking summary judgment pursuant to Rule 56.  (D.I. 64).  The Court thus understands the requests to "dismiss" the claims to be requests for entry of summary judgment in Defendant's favor.

[5]    Defendant does not define "wrongful termination claims" in its briefs, but from the context, the Court understands this term to refer to Plaintiff's Title VII and DDEA retaliation claims.

April 2017 Charges are sufficient. (D.I. 71 at 8-11). Defendant disagrees, asserting that those Charges are insufficient because they were both submitted "well before [Plaintiff's] termination." (D.I. 76 at 1).

"As a precondition to the commencement of a Title VII action in court, a complainant must first file a charge with the [EEOC]." *Fort Bend Cnty.*, 139 S.Ct. at 1846. If the agency does not act within a specified time frame or chooses not to move forward with the charge, it must notify the filer, which is typically done with a "right to sue" letter. The filer then has ninety days to bring suit based on the allegations in its charge.[6] 42 U.S.C. § 2000e-5(f)(1).

The ambit of a court-bound filer's complaint, however, is not limited to the specific actions alleged in its EEOC charge(s). Rather, it "is defined by the scope of the EEOC investigation which can reasonably be expected to grow out of [the] charge[(s)] . . ., regardless of the actual scope of the investigation." *Daoud v. City of Wilmington*, 894 F. Supp. 2d 544, 553 (D. Del. Oct. 1, 2012) (quoting *Smiley v. Daimler Chrysler*, 538 F. Supp. 2d 711, 719 (D. Del. Feb. 21, 2008)); *see also Barzanty v. Verizon PA, Inc.*, 361 F. App'x 411, 414 (3d Cir. 2010). This "does not necessarily preclude a plaintiff from asserting a claim for the mere failure to check a box on an EEOC Charge Form," though "it does prevent [her] from 'greatly expanding an investigation simply by alleging new and different facts." *Barzanty*, 361 F. App'x at 414 (citations omitted).

To determine whether a plaintiff has met Title VII's administrative requirements, a court must ask whether "there [is] a close nexus between the facts supporting the claims raised in the charge[(s)] and those in the complaint." *Smiley*, 538 F. Supp. 2d at 721 (citing *Howze v. Jones &*

---

[6] It is not disputed that Plaintiff filed suit within the required time frame if her January 2016 Charge or her April 2017 Charge is deemed sufficient to satisfy the Title VII administrative requirements. The EEOC notified Plaintiff of its decision regarding those charges and her resultant right to sue on March 1, 2018. (D.I. 67 at A76-77). She filed the instant lawsuit within ninety days, *i.e.,* on May 29, 2018. (D.I. 1).

*Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976)). For example, retaliation for an EEOC Charge is often found to fall within the scope of a reasonable EEOC investigation of that same charge. *See, e.g.*, *Lantz v. Waynesboro Area Sch. Dist.*, No. 16-cv-0224, 2016 WL 6039129, *4 (M.D. Pa. Oct. 14, 2016) (making such a ruling and noting that the Second, Fourth, Seventh, and Tenth Circuits have found the same); *Farber v. Gen. Elec. Co.*, No. 93-2349, 1994 WL 46519, at *5 n.2 (E.D. Pa. Feb. 15, 1994) (making such a ruling); *see also Howze*, 750 F.2d at 1212 (holding, in the context of a motion to amend, that a "new retaliation claim may be fairly considered an explanation of the original charge").

As noted, Plaintiff filed two relevant Charges of Discrimination with the EEOC and the DDOL – one in January 2016 and the other in April 2017. The forms documenting those complaints have sections for providing, *inter alia*, the type of discrimination alleged, any "adverse employment action" claimed, the "date(s) of discrimination," and a "Summary of Allegations." (*E.g.*, D.I. 67 at A7, A49). For the "date(s) of discrimination," the person completing the form may indicate "continuing action" by checking a box next to those words. (*Id.*).

Plaintiff's January 2016 Charge form states that she alleged discrimination based on race, sex, and retaliation. (*Id.* at A7). It also lists "layoff" as the adverse employment action taken against her and provides one "date of discrimination" – October 13, 2015 – which is the date Plaintiff was laid off from the Clayton Plant for the first time. (D.I. 66 ¶ 4; D.I. 67 at A7). The "continuing action" box is not checked and the "Summary of Allegations" states the following:

> Charging Party asserts that she was discriminated against based on her race, gender, and in retaliation for engaging in a protected activity. Charging Party asserts that she was laid off on October 13, 2015 based on her protected class. Charging Party asserts that Alvin Constantine (male, Asian) and Jaime Dobies (male, white) discriminated against black employees by separating them from white and Hispanic employees in the workplace. Charging Party asserts that Betty (female, white)

spoke to her in a demeaning manner for creating a mess in Betty's office. Charging Party asserts that she contacted Jeff Warehime on multiple occasions to inform him of the ongoing racial discrimination and sexual harassment at the location. Charging Party asserts that, as a result of this phone call, she was eventually laid off.

(D.I. 67 at A7).

Plaintiff's April 2017 Charge form states that she again asserted discrimination based on race, sex, and retaliation, but lists "Harassment, Terms and Conditions, Failure to Promote" as the adverse actions taken against her and January 16, 2017 as the "date(s) of discrimination." (*Id.* at A49). Again, the "continuing action" box is not checked. (*Id.*). The "Summary of Allegations" recites:

> Charging Party asserts she filed a prior charge of discrimination with DDOL (SUL010816 / 17C-2016-00222C)[.] Respondent harassed her and denied her a promotion in retaliation for her complaint. Specifically, Charging Party asserts third shift supervisor, Jaime Dobies (male) has called less senior employees back to work, failed to pay her wages for hours worked, refused to show her open positions, violating the terms of the contract, pressured her to sign grievances without union representatives, and disciplined her for using the bathroom in an effort to get her to quit. Charging Party asserts Respondent is treating her less favorably because of her race, sex, and in retaliation for her initial discrimination complaint.

(*Id.*).

Thus, Plaintiff alleged discrimination based on race, sex, and retaliation in both her January 2016 and April 2017 Charges, and additionally alleged discrimination in the latter in retaliation for her filing of the former.[7] (*Id.*). Similarly, Plaintiff's instant Title VII and DDEA wrongful termination claims allege that she was terminated for "complaining about discrimination – both when [she did so] internally, and later when [she] filed discrimination charges with the [DDOL] and [EEOC]." (D.I. 62 ¶¶ 64, 74). Thus, Plaintiff's two sets of allegations are aligned in such a

---

[7]     The reference number of the prior charge of discrimination mentioned in Plaintiff's April 2017 Charge form corresponds with the reference number on her January 2016 Charge form. (D.I. 78 at A7, A49).

manner that a close nexus exists between the facts underlying both. Additionally, to the extent that any significance can be taken from the fact that Plaintiff's charge forms each list only one date of discrimination and neither has a check mark next to the "continuing action" option, *see Barzanty*, 361 F. App'x at 414 (noting that a failure to "check a box" on an EEOC charge form does not necessarily bar a later legal claim), Defendant's acknowledgement that the conduct alleged in the charge forms occurred over an extended period of time, (D.I. 65 at 4-7), and the April 2017 Charge form's use of the present tense (e.g., "Charging Party asserts Respondent is *treating* her less favorably . . . ."), (D.I. 67 at A49), counteract an implication that Plaintiff alleged isolated, non-continuing adverse action in her EEOC charges.

As noted, however, Defendant also argues that Plaintiff's wrongful termination claims cannot fall within the ambit of her EEOC charges because those charges are temporally remote from her termination and because the DDOL investigation – which was the basis for the EEOC's decision not to pursue the allegations in her charges – was completed before Plaintiff's termination. (D.I. 76 at 2-3). Defendant cites no support for either of these propositions[8] and the Court finds them uncompelling in light of the applicable standard. *See Daoud*, 894 F. Supp. 2d at 553 (noting courts must ask whether the claims fall within the scope of the EEOC investigation which can reasonably be expected to grow out of EEOC charges, regardless of whether the investigation actually reached purported harm justifying the claim); *see also Barzanty v.*, 361 F. App'x at 414. Moreover, temporal proximity is less compelling in this case because Plaintiff's April 2017 Charge form describes ongoing retaliation, (D.I. 67 at A49), which could reasonably be expected to

---

[8]     Defendant cites *LeBoon v. Lancaster Jewish Cnty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2017). *Leboon*, however, discussed timing in relation to the issue of causation in Title VII cases, not the statute's administrative requirements. (D.I. 76 at 3). The Court analyzes such causation issues – including temporal proximity – *infra*.

continue before culminating in termination, especially where, as here, the employee alleges that the employer is attempting to force her to quit.

Therefore, based on the close nexus between the facts supporting Plaintiff's January 2016 and April 2017 Charges and her current Title VII and DDEA wrongful termination claims, Plaintiff has satisfied the administrative exhaustion requirements of Title VII and the DDEA with respect to her wrongful termination claims, and Defendant is not entitled to summary judgement on those claims on that basis.

2.     Retaliation Claims

Next, Defendant argues that it is entitled to summary judgment on the substance of Plaintiff's Title VII and DDEA retaliation claims because she allegedly fails to provide sufficient evidence connecting her termination to a retaliatory animus.  (D.I. 65 at 1).  Plaintiff argues that she can prove these claims either via "direct evidence," presumably meaning under the "mixed motive" theory initially approved in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989), or, alternatively, through the three-step burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  (D.I. 71 at 11-13, 15).  The Supreme Court, however, has ruled that "the mixed motive analysis set forth in *Price Waterhouse*, and subsequently codified in the Civil Rights Act of 1991," is applicable to discrimination based on "race, color, religion, sex, or national origin," but "is not applicable to retaliation claims," which are governed by a separate provision of Title VII.  *Univ. of Tex. Southwestern Med. Center v. Nassar*, 570 U.S. 338, 351-53 (2013) ("Title VII's antiretaliation provision, which is set forth in § 2000e-3(a), appears in a different section from Title VII's ban on status-based discrimination. . . .  When Congress wrote the motivating-factor provision in 1991, it chose to insert it as a subsection within § 2000e-2, which contains Title VII's ban on status-based discrimination . . . and says nothing about discrimination. . . .  This fundamental difference in statutory structure renders inapposite decisions

which treated retaliation as an implicit corollary of status-based discrimination."); *see also*, *Egan v. Delaware River Port Auth.*, 851 F.3d 263, 272-73 (3d Cir. 2017) (noting that, in *Nassar*, the Supreme Court "recognized that different causation standards may apply to different claims"); *Rumanek v. Indep. Sch. Mgmt., Inc.*, 50 F. Supp. 3d 571, 578 n.4 (D. Del Jan. 10, 2014). Thus, only Plaintiff's *McDonnell Douglas* argument is relevant here. *See, e.g.*, *Rumanek*, 50 F. Supp. 3d at 578.

Under *McDonnell Douglas*'s three-step burden-shifting framework, Plaintiff must first make out a *prima facie* case of retaliatory discrimination. *Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 193-94 (3d Cir. 2015). If she is successful, the burden of production shifts to Defendant to articulate a "legitimate, non-retaliatory reason for having taken the adverse action." *Id.* If Defendant successfully completes this second step, Plaintiff then has the opportunity to present evidence indicating that Defendant's reason(s) are mere pretext for a retaliatory motive. *Id.* Although the burden of production shifts back and forth, Plaintiff "has the ultimate burden of persuasion at all times." *Id.* (citing *Reeves*, 530 U.S. at 143).

a.      *Prima Facie Case*

To establish a *prima facie* case of retaliation under Title VII, Plaintiff must present evidence indicating that she engaged in protected activity, suffered an adverse employment action contemporaneous with or after engaging in that protected activity, and a causal link exists between the protected activity and the adverse employment action. *See, e.g.*, *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 320 (3d Cir. 2008); *see also Daniels*, 776 F.3d at 193-94. Defendant assumes, for summary judgment purposes only, that Plaintiff can establish the first two elements.[9] (D.I. 65 at 13). Thus, the Court focuses on the third – whether Plaintiff has presented

---

[9]      Despite assuming that Plaintiff can establish the first two elements, Defendant then goes on to argue that only three of Plaintiff's asserted protected activities – her two EEOC

sufficient evidence of a causal link between a protected activity and an adverse employment action taken against her to create a genuine issue of material fact. Yet assessing the third element requires, by definition, identifying at least one qualifying protected activity and one qualifying adverse event. As Defendant admits, (D.I. 65 at 14 n.16, 17-18), Plaintiff's two relevant EEOC charges and her termination qualify for these categories, respectively. *See also, e.g.*, *Leboon v. Lancaster Jewish Community Center Ass'n*, 503 F.3d 217, 232 & n.9 (3d Cir. 2007). The Court, therefore, assesses whether Plaintiff has sufficiently established a causal connection between her two EEOC charges and her termination to survive summary judgment.

The causal connection element of a retaliation claim may be satisfied by "a broad array of evidence," *id.* at 232 (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 284 (3d Cir. 2000)), including any "pattern of antagonism" or evidence of retaliatory animus following the protected conduct, temporal proximity between the protected activity and the adverse employment action, the use of "inconsistent reasons" for adverse action, or any other evidence "from which causation can be inferred," *Farrell*, at 280-81. *See also Daniels*, 776 F. 3d at 193-94. Temporal proximity can be sufficient on its own, but only if "'unusually suggestive' of a retaliatory motive." *Krouse*

---

charges and one of her calls to Jeffrey Warehime – and one of her asserted adverse employment actions – her termination – qualify as such. (D.I. 65 at 14 n. 16; *id.* at 17-18). Plaintiff, on the other hand, does not explicitly address the first two elements but does make arguments suggesting she believes she has suffered more than one adverse employment action (*e.g.*, "Plaintiff has alleged several discrete acts, along with continuous harassment over several years." (D.I. 71 at 17-18)) and relies on evidence that potentially indicates that she suffered non-termination adverse employment action, (*e.g.*, Aretta Butler's statement that Jaime Dobies gave Plaintiff "all the worst jobs" (D.I. 71 at 12)). Because the Court takes Defendant's assumption at face value, however, and finds that Plaintiff has sufficiently established the third element of this *prima facie* claim at least with respect to her EEOC Charges and termination to survive summary judgment, it makes no ruling as to whether other asserted protected activities and adverse events qualify as such.

*v. Am. Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (citations omitted); *see also Daniels*, 776

F. 3d at 193-94 (citing *Leboon*, 503 F. 3d at 232).

Plaintiff asserts that the following constitutes "direct evidence" that Defendant took

adverse action against her in retaliation for her complaints of workplace discrimination[10]:

- Deposition testimony and affidavits of four Clayton Plant employees indicating that supervisors were trying to make Plaintiff quit:

  - Former Clayton Plant employee Kisha Dickson stated in an affidavit that one of Defendant's supervisors, Jaime Dobies, "said he was trying to make [Plaintiff] quit. I heard Mr. Dobies and other employees take bets on how long it would take for [Plaintiff] to quit," (D.I. 71 at 12; *see also* D.I. 71 Ex. A ¶ 5),

  - Former Clayton Plant employee Aretta Butler stated in her deposition that Jaime Dobies gave Plaintiff "all the worst jobs that he could give her" in "2017," (D.I. 71 at 12; *see also* D.I. 71 Ex. C at 33:24 – 34:8),

  - Former Clayton Plant employee Karriem Keys stated in his deposition that Jaime Dobies said he "had it out" for Plaintiff, (D.I. 71 at 12; *see also* D.I. 71 Ex. D at 156:17-22, 160:20-161:2),

  - Former Clayton Plant employee Pamela Joseph stated in an affidavit "My supervisors were hard on [Plaintiff]. . . . They would give her conflicting instructions so that she wouldn't be able to follow all of the instructions. . . . I overheard them say that they would get rid of her one way or another. I overheard them say they would put her on certain jobs to make her quit," (D.I. 71 at 12; *see also* D.I. 71 Ex. B ¶ 12);

- Deposition testimony of former Clayton Plant employee Aretta Butler allegedly "characterize[ing] Dobies' comments as repeating what was said in [H.R.]," (D.I. 71 at 13; *see also* 71 Ex. C at 32:14 – 33:9);

- Note in Plaintiff's H.R. file that reads: "Darlene is saying we are discriminating . . . . She is making our good people quit because of grievances & not being able to do her job," (D.I. 71 at 13; *see also* D.I. 71 Ex. E);

---

[10]    Plaintiff does not detail how she meets the elements of a *prima facie* case of retaliation; she simply states that she "can prove her case under the *McDonnell Douglas* burden-shifting framework" and skips straight to step three. (*See* D.I. 71 at 15). Thus, the Court applies the "direct evidence of retaliation" she asserts to the *prima facie* elements.

- An alleged "pattern of disciplining employees [at the Clayton Plant] right after they complained about racism," evidenced by:

  o A former Clayton Plant employee who complained about "anti-black racism" being "written up" and terminated at a meeting to discuss those complaints, (D.I. 71 at 13; *see also* D.I. 71 Ex. G at 62:23-25, 65:24-66:4; D.I. 71 Ex. F);

  o A former Clayton Plant employee being "written up" by a supervisor "for an incident in which [the employee] was not even present" seven days after the employee complained about the same supervisor's use of a racial slur, (D.I. 71 at 13; *see also* D.I. 72 Ex. H);

  o The former Clayton Plant shop steward who "helped [Plaintiff] lodge complaints," – Aretta Butler – being "terminated on the same day as [Plaintiff] for the same reason – 'no call, no show' – even though [she] called" an H.R. representative about her absence in advance, (D.I. 71 at 13; *see also* D.I. 71 Ex. C at 96:3-24, 101:4 – 103:23);

  o Defendant's H.R. "file on June Young[, which] contains a racism complaint about June Young, immediately followed by a list of problems with June Young's work," (D.I. 71 at 13; *see also* D.I. 72 Ex. I).

Additionally, Plaintiff asserts that former supervisor Greg Kirtley's deposition testimony indicates that "[s]upervisors would meet with [H.R.] personnel many times a week, including Shivonne Urbano," (Plaintiff's H.R. representative at the time) and "[m]ost of the meetings were about attendance and time issues." (D.I. 74 at 8 ¶ 13). Plaintiff further uses Kirtley's testimony to assert that Shivonne Urbano – the person who signed Plaintiff's termination letter – was not solely responsible for the decision to terminate her employment. (D.I. 74 at 5 ¶ 54).

Defendant denies that Kirtley was involved in the decision to terminate Plaintiff, and notes that he testified that "he met with Helena Picozzi" (Shivonne Urbano's predecessor, (D.I. 78 at C75)) "on time and attendance matters, computer system issues, or employee missed punches," but only saw Urbano in morning meetings and to discuss H.R. matters when he needed clarification. (D.I. 77 ¶ 13). Defendant further argues that Plaintiff's other asserted facts are insufficient to constitute the necessary evidence of a retaliatory animus under a "mixed motive"

theory for several reasons: none of the "alleged statements by other employees . . . , even if accepted as true" has "anything to do with Urbano – the person who undisputedly made the decision to terminate Plaintiff"; Plaintiff's argument "incorrectly assume[] that Jaime Dobies made or was involved in the . . . decision to terminate Plaintiff"; and most of these statements from other employees lack any timeframe or context for the allegations they assert. (D.I. 78 at 4-5). Defendant also argues – without evidentiary support – that the unsigned, undated note in Plaintiff's H.R. file was "written by Helena Picozzi, not [Shivonne] Urbano," on June 6, 2016, "over a year and a half before Plaintiff's termination," and concerns Plaintiff's complaint regarding being told by a supervisor that she could "go buck naked if that would help" after she requested a work smock. (D.I. 76 at 5-6).[11] Lastly, Defendant asserts that Plaintiff's allegation that it has a "pattern of disciplining employees right after they complained about racism" is unsupported and lacks "a causal connection to any complaint." (Id. at 6).

In addition these criticisms of Plaintiff's asserted evidence of retaliation, Defendant argues that Plaintiff cannot establish a causal connection between a protected activity and her termination because she "cannot point to any direct evidence of retaliatory intent,"[12] "must therefore rely on temporal proximity," and the time between her EEOC charges and termination are "far beyond the time frame recognized by the Third Circuit as being indicative of retaliatory intent." (D.I. 65 at 13-15). It also argues that Plaintiff's deposition testimony indicates that she was aware that failure

---

[11]    Both Plaintiff's and Defendant's citations lead to the same document. (D.I. 76 at 5-6).

[12]    The Court notes that, despite this argument, direct evidence is not required under the first step of the *McDonnell Douglas* burden-shifting framework. *See Wilkerson*, 522 F.3d at 320 (explaining that the first step of *McDonnell Douglas* requires only a *prima facie* showing of the enumerated elements).

to submit a proper doctor's note could subject her to termination and that she believed her worker's compensation claim caused her termination.  (*Id.* at 14-15).[13]

Even assuming Defendant is correct that temporal proximity weighs against Plaintiff and her statements can be interpreted in the manner it alleges, she has presented sufficient contrary evidence to give rise to a genuine issue of material fact on this element.  First, the note in Plaintiff's H.R. file suggests the presence of a retaliatory animus towards Plaintiff by someone in the H.R. department.  Although undated, if Defendant is correct, it was written on or around June 6, 2016 – after Plaintiff filed her January 2016 Charge.  *See Farrell*, 206 F.3d at 280-81 (stating causation can be established by evidence of a "retaliatory animus" following the protected conduct).  Second, the testimony and affidavits of Plaintiff's former coworkers suggest both a pattern of communication between H.R. and Clayton Plant supervisors regarding employees and a pattern of antagonism by Clayton Plant supervisors towards Plaintiff.  *See id.* (stating causation can be established by evidence of a "pattern of antagonism" following the protected conduct).  Although only one of Plaintiff's former coworkers could say when Clayton Plant supervisors were trying to get Plaintiff to quit, that coworker stated it occurred in 2017 – the same year Plaintiff filed her second EEOC charge and a year after she filed the first.  *See supra*.  Moreover, as described *supra*, Plaintiff's April 2017 Charge form alleges ongoing retaliation as a result of her January 2016 Charge.  *See Mandel*, 706 F.3d at 168 (finding that EEOC charges can raise genuine issues of material fact on their own (citing *Liotta*, 629 F.2d at 907)).  Based on this evidence, a factfinder could reasonably believe that, following her filing of at least the January 2016 Charge, a retaliatory

---

[13]    Defendant also argues that none of the remaining adverse actions identified by Plaintiff is sufficiently close to her protected activity to establish retaliatory intent.  (D.I. 65 at 15-16). The Court finds no need to address these arguments given its finding on the admitted protected activities and adverse actions.

animus existed against Plaintiff and she was subjected to a pattern of antagonism. That same factfinder could reasonably believe that the animus and pattern of antagonism continued throughout 2017 before culminating in her termination on December 28 of that year.

Thus, Plaintiff has satisfied the first step of *McDonnell Douglas* for purposes of this motion.

b.    *Legitimate, Non-Discriminatory Reason*

Defendant's burden to establish a legitimate, non-discriminatory reason for the purported adverse employment action in the second step is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). It is a burden of production, not persuasion, and therefore involves no credibility assessment. *Reeves*, 530 U.S. at 142. In other words, Defendant "need not prove that the tendered reason *actually* motivated its behavior," *Fuentes*, 32 F.2d at 763. Merely "articulat[ing] a legitimate, non-discriminatory reason" is sufficient. *Larochelle*, 210 F. Supp. 3d at 678 (citing *McNeil v. Greyhound Lines, Inc.*, 69 F. Supp. 3d at 522 (E.D. Pa. 2014)).

Here, Defendant asserts that it "terminated Plaintiff's employment when she failed to return to work or submit additional medical documentation extending her leave beyond its expiration on December 19, 2017." (D.I. 65 at 24). It is undisputed that Plaintiff did not return to work after December 19, 2017 and Defendant's assertion is corroborated by the justification provided in Plaintiff's termination letter, (D.I. 67 at A74). Thus, Defendant has met its burden for purposes of this motion.

c.    *Pretext*

To satisfy the third and final step of *McDonnell Douglas* and establish that Defendant's proffered non-discriminatory reason for terminating her employment is pretext, Plaintiff must come forth with "some evidence, direct or circumstantial, from which a factfinder could reasonably either: (a) "disbelieve [Defendant's] articulated reasons"; or (b) "believe that an invidious

discriminatory reason was more likely than not a motivating factor or determinative cause of [Defendant's] action." *Fuentes*, 32 F.3d at 764. In other words, "to avoid summary judgment, [Plaintiff's] evidence rebutting [Defendant's] proffered legitimate reason must allow a factfinder reasonably to infer that *each* of [its] proffered non-discriminatory reasons . . . was either a post-hoc fabrication or otherwise did not actually motivate the employment action." *Kautz v. Met-Pro Corp.*, 412 F.3d 463, 467 (3d Cir. 2005) (quoting *Fuentes*, 32 F.3d at 764); *see also Daniels*, 776 F.3d at 193-94. To establish pretext under the first method, Plaintiff's evidence must point out "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons" sufficient to show that [its] reason for termination was discriminatory. *Willis v. UPMC Children's Hosp.*, 808 F.3d 638, 644–45 (3d Cir. 2015). To establish pretext under the second, she must submit proof that Defendant previously discriminated against her, discriminated against others within her protected class, or treated other similarly situated individuals outside her class more favorably than those within it. *Id.* at 645.

Plaintiff's burden in this final stage is "difficult." *Kautz*, 412 F.3d at 467 (quoting *Fuentes*, 32 F.3d at 765). She cannot show pretext with evidence that Defendant's decision "was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated [Defendant], not whether [Defendant] is wise, shrewd, prudent, or competent.'" *Id.* at 467 (quoting *Fuentes*, 32 F.3d at 765); *see also Daniels*, 776 F.3d at 198-99. As such, the Court must look "carefully" at Defendant's proffered reason as well as Plaintiff's claim of pretext. *Kautz*, 412 F.3d at 468.

Plaintiff argues that she can establish pretext in several ways. First, she argues that Defendant's purported justification "depends on misapplying" the FMLA. (D.I. 71 at 15). Second, she asserts it lacks credence because the deposition testimony and affidavits she has put forward

show that Clayton Plant supervisors had an animus toward a protected class, the dates underlying Defendant's justification do not make sense, and the timing of her termination is suspect in light of the simultaneous termination of the shop steward who assisted her with H.R. complaints. (*Id.* at 15-17). Third, Plaintiff claims that Defendant previously discriminated against her and discriminated against others in retaliation for complaining about workplace conditions.[14] (D.I. 71 at 17-18).

Defendant counters that Plaintiff's FMLA argument is misplaced, because "even a mistaken belief about an employee's misconduct is sufficient to establish a discriminatory motive," (D.I. 76 at 8 (citing Third Circuit precedent)), and her "credence" arguments are "without merit" because she "has [not] supplied direct evidence of retaliation," (*Id.*). Defendant rebuts Plaintiff's other arguments by asserting that "there has been no judicial finding of a discriminatory motive at any time," the "[m]ere allegations" of others "do not establish discrimination," and, even if they could, the allegations of Plaintiff's former coworkers "do not show that [Shivonne] Urbano's decision was based on discriminatory animus." (*Id.*).

Despite Defendant's arguments, the Court finds, drawing all reasonable inferences in Plaintiff's favor, that a factfinder could reasonably believe that Defendant's purported reason for terminating Plaintiff's employment did not actually motivate that decision. The depositions and affidavits of her former coworkers, in conjunction with the statements in Plaintiff's own EEOC charges and the evidence that the shop steward who assisted Plaintiff in filing H.R. complaints was fired on the same day as Plaintiff, for the same reason, despite also allegedly informing Defendant that she was entitled to FMLA leave, (*see* D.I. 71 Ex. C at 96:3-24, 101:4 – 103:23 (Butler

---

[14]    Plaintiff also asserts that Defendant favored others outside the protected class, but the substance of her argument relates to her claims of race and sex discrimination, not retaliation. (*See* D.I. 71 at 18).

Deposition Transcript); D.I. 73 Ex. J at 14-15 (Plaintiff Deposition Transcript at 229:1-21)), collectively sow enough doubt in Defendant's proffered termination justification that a reasonable juror could disbelieve that justification.

Moreover, contrary to Defendant's assertion, Plaintiff relies on more than "[m]ere allegations" – she relies on statements in affidavits, depositions, EEOC charges, and other documents in the record. *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: citing to particular parts of materials in the record, including depositions, documents, . . . affidavits . . . ."); *Mandel*, 706 F.3d at 168 (finding EEOC charges can raise genuine issues of material fact on their own (citing *Liotta*, 629 F.2d at 907)). Additionally, as already noted, Plaintiff has submitted evidence rebutting Defendant's assertion that Shivonne Urbano was solely responsible for the decision to terminate her employment. (*See* D.I. 74 at 5 ¶ 54).

Thus, Defendant is not entitled to summary judgment on Plaintiff's retaliation claims under Title VII and the DDEA, as she has sufficiently established a genuine issue of material fact for those claims under the *McDonnell Douglas* burden-shifting framework.

3.     Discrimination and Disparate Treatment Claims Based on Race and Sex

Next, Defendant argues that it is entitled to summary judgment on Plaintiff's Title VII and DDEA discrimination and disparate treatment claims based on race and sex because she has failed to put forth evidence of a causal link between adverse employment action taken against her and her membership in either of those protected classes. (D.I. 65 at 1). Plaintiff again argues that she can establish these claims under either the *Price Waterhouse* "mixed motive" theory or the *McDonnell Douglas* three-step (*prima facie* case – non-discriminatory reason – pretext) burden-shifting test. (D.I. 71 at 13-15). As already noted, for these claims, she can. *See Egan*, 851 F.3d at 272-73 ("Notably, the [Supreme] Court [in *Nassar*] distinguished Title VII's anti-retaliation

provision from its 'principal' anti-discrimination provision, which states that a plaintiff establishes discrimination when he or she 'demonstrates that race, color, religion, sex, or national origin was a motivating factor, for any employment practice, even though other factors also motivated the practice.'" (quoting *Nassar*, 570 U.S. at 348-49 (quoting 42 U.S.C. § 2000e-2(m)))).

Under the *Price Waterhouse* "mixed motive" theory, Plaintiff must present sufficient direct or circumstantial evidence[15] that Defendant placed substantial reliance on a proscribed discriminatory factor in making its decision to take adverse employment action against her. *E.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 92, 101-02 (2003) (holding that direct evidence is not required for court to deliver mixed-motive jury instruction for Title VII claims under § 2000e–2(m)); *Egan*, 851 F.3d at 274; *Church v. Sears Holding Corp.*, 605 F. App'x 119, 123 (3d Cir. 2015). If she can do that, the burden shifts to Defendant to prove that it would have still taken the employment action even if it had not considered the proscribed factor. *Church*, 605 F. App'x at 123.

"Direct evidence" in this context means evidence "'sufficient to allow the jury to find that the decision makers placed a substantial negative reliance on [the illegitimate criterion] in reaching their decision.'" *Church*, 605 F. App'x at 123 (quoting *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 512 (3d Cir.2004)). "Stray remark[s]," "vague" statements, "innocuous conversation jabs" in social settings, "random office banter," remarks by non-decisionmakers, and statements by decisionmakers unrelated to the contested employment decision do not constitute direct

---

[15] "The [Desert Palace] Court observed that Title VII's silence regarding the type of evidence necessary in mixed-motive cases also suggests that we should not depart from the conventional rule of civil litigation that generally applies in Title VII cases, which requires a plaintiff to prove his case by a preponderance of the evidence . . . using direct or circumstantial evidence." *Egan*, 851 F.3d at 274 (quoting *Desert Palace*, 539 U.S. at 98-99) (internal quotation marks & modifications omitted).

evidence, particularly if temporally remote from the date of decision. *See, e.g., Fakete v. Aetna, Inc.*, 308 F.3d 335, 337-38 n.2, 339-40 (3d Cir. 2002); *Griffiths v. CIGNA Corp.*, 988 F.2d 457, 470 (3d Cir. 1993); *Silver v. Am. Inst. Of Certified Pub. Accountants*, 212 F. App'x 82, 85 (3d Cir. 2006).

Circumstantial evidence, on the other hand, is sufficient under a "mixed motive" theory "if [it] can 'fairly be said to directly reflect the alleged unlawful basis' for the adverse employment decision." *Fakete*, 308 F.3d at 339 (citations omitted); *see also Egan*, 851 F.3d at 274. For example, "statements of a person involved in the decisionmaking process that reflect a discriminatory or retaliatory animus of the type complained of in the suit" are sufficient even "if the statements are not made at the same time as the adverse employment decision, and thus constitute only circumstantial evidence that an impermissible motive substantially motivated the decisions." *Id.*

The Third Circuit has made clear that satisfying this standard is a "high hurdle" – "[t]he burden . . . shifts . . . 'only after the plaintiff has proven that her employer acted unlawfully,' and not merely 'on the basis of a *prima facie* showing.'" *Walden v. Georgia-Pacific Corp.*, 126 F.3d 506, 513-14 (3d Cir. 1997). In other words, Plaintiff must put forth "evidence [] sufficient to permit the factfinder to infer that a [impermissible] attitude was more likely than not a motivating factor in the employer's decision." *Id.*

The Court considers the parties' arguments for Plaintiff's discrimination and disparate treatment claims based on race and based on sex under both this "mixed motive" theory and the *McDonnell Douglas* burden-shifting test laid out *supra*.

        a.     *Race*

Plaintiff alleges that the following constitutes "direct evidence" of racial discrimination and disparate treatment against her:

- Deposition testimony of former Clayton Plant employee Pamela Joseph that:
  - Clayton Plant supervisor "Jaime Dobies would call black employees 'black' as a name instead of their real names. He would say black people are 'lazy' and 'only play basketball.' He would give black employees worse jobs. He would write up employees he didn't like for made-up reasons . . . ." (D.I. 71 at 13; *see also* D.I. 71 Ex. B ¶ 16);

- Affidavit of former Clayton Plant employee Pamela Joseph that:

  - "The darker, the browner your skin got, the more you had a problem," (D.I. 71 at 14; *see also* D.I. 78 C60 – C61 (Joseph Deposition at 229:21 – 230:2));

- Affidavit of former Clayton Plant employee Kisha Dickson that "[f]or example, one supervisor, Herman [Perez], would say 'get your black ass back to work,' and he was wearing his 'pants like a nigger,'" (D.I. 71 at 14; *see also* D.I. 71 Ex. A ¶ 4);

- Statement in meeting minutes from a July 6, 2016 meeting between Clayton Plant supervisory personnel and former Clayton Plant employee Fred Williamson that: "Fred indicated that there is favoritism – the Spanish vs. black. And Valerie indicated that her supervisor, Herman, said 'me like a "nigger" now.' 'Me forgot me pants, me like a "nigger" now.' Fred indicated that when you go to [Plant Manager] Alvin nothing is ever done." (D.I. 71 at 14; *see also* D.I. 71 Ex. F at 2);

- Additional "allegations of discrimination" in the "Savage charge," an EEOC charge filed by another Clayton Plant employee (D.I. 71 at 14; *see also* D.I. 72 Ex. H).

In response, Defendant asserts that Plaintiff "did not cite any racial remark made directly to her," that Herman Perez was reprimanded by Defendant for his use of "nigger," and that his use of that slur was temporally remote from any adverse employment action taken against her, was promptly investigated by Defendant, and was determined to have been the result of a misunderstanding regarding the meaning of the term. (D.I. 76 at 6-7).

Even taking all reasonable inferences in her favor, Plaintiff's race-based discrimination and disparate treatment claims cannot survive summary judgment under a "mixed motive" theory. None of the evidence presented involves or relates to Plaintiff or an adverse employment action taken against her; thus, a reasonable factfinder could not find or infer that a racially biased attitude was more likely than not a motivating factor in a decision regarding the terms, conditions,

disciplines, or privileges of her employment, as her complaint alleges. (D.I. 62 ¶ 63). *See Walden*, 126 F.3d at 513-14 (stating that *Price Waterhouse* requires "evidence [] sufficient to permit the factfinder to infer that a [impermissible] attitude was more likely than not a motivating factor in the employer's decision").

For many of the same reasons, a reasonable factfinder could also not find that Plaintiff has made out a *prima facie* case of discrimination or disparate treatment based on her race to satisfy the first step of *McDonnell Douglas*. Defendant assumes for summary judgment purposes that Plaintiff can establish the first two elements – that she is a member of a relevant protected class and was qualified for a position she sought – but argues that she cannot prove the latter two – that she suffered adverse employment action or that the action occurred under circumstances that would give rise to an inference of intentional discrimination. (D.I. 65 at 16-18). In addition to its criticism of the evidence she has offered (noted above), Defendant asserts that Plaintiff's race-based discrimination claims must fail because "she cannot identify any adverse employment action taken against her, nor can she establish a causal connection between the only adverse employment action in this case – [her] termination – and her membership in a protected category." (*Id.* at 17-18).[16] Thus, the Court again begins with the third element – whether Plaintiff has established that she suffered an adverse employment action.

An adverse action for Title VII purposes is limited to those actions that are materially adverse, *i.e.*, that are of such a nature that a reasonable employee may have been dissuaded from

---

[16] The Court notes that Defendant's purported criticism of Plaintiff's evidence that she "does not cite any evidence of a racial remark made directly to her" misapprehends the relevant question under *McDonnell Douglas*. The question under *McDonnell Douglas* is whether Plaintiff has put forward evidence that she suffered an adverse employment action under circumstances that could give rise to an inference of intentional discrimination. *Mandel*, 706 F.3d at 167. Restricting Title VII discrimination cases to those instances where a remark was made directly to a plaintiff would ignore the intractable nature of many biases.

making or supporting a charge of discrimination. *See Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006). The category "encompasses all tangible employment actions such as 'hiring, firing, failing to promote, reassignment or a decision causing a significant change in benefits.'" *Sherrod v. Philadelphia Gas Works*, 57 F. App'x 68, 75 (3d Cir. 2003) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). It can also include disparate treatment, *e.g., Larochelle*, 210 F. Supp. 3d at 689-90, constructive discharge, *e.g., Sherrod*, 57 F. App'x at 75, and paying an individual a lower salary, *e.g., id.* The standard, however, draws a line between trivial and serious harms and only allows Title VII to address the latter. *See Burlington N.*, 548 U.S. at 67-68.

Plaintiff has alleged in her Complaint that employees were separated according to their race, her pay was withheld, her medical information was disclosed, she was refused a list of open positions to which she was entitled, she was directed to sign grievances without a union representative present, she was subjected to unfair discipline, and she was not promoted. (D.I. 62 ¶ 63). The deposition testimony and affidavits she has presented additionally indicate that African American employees like Plaintiff were given worse jobs and shorter breaks than those of other races. *See supra.* Finally, Plaintiff was terminated. *Id.*

Withholding of pay, denial of access to open positions, unfair discipline, failure to promote, assignment of worse jobs, and termination all meet the definition of "tangible employment actions" articulated above. *See Sherrod*, 57 F. App'x at 75. The other alleged actions may qualify as "tangible employment action" in some instances but cannot here because there is no indication that any of them resulted in "a significant change in benefits." *See id.* Plaintiff, however, has also not put forward sufficient evidence for most of the qualifying actions. Although it is undisputed that Plaintiff's employment was terminated, she has not established how or why jobs assigned to herself

or other African American employees were "worse" than any others such that the assignments could qualify as "significant change[s] in benefits." She has also presented no evidence that her pay was withheld, she applied or was eligible for, and was subsequently denied, a promotion, or she was subjected to unfair discipline. Additionally, to the extent that she had disputes with Defendant regarding access to particular job openings, Defendant either compensated her for the perceived wrong or Plaintiff admitted that she was shown the disputed job posting(s). (*See* D.I. 67 at A39, A41; D.I. 68 at A140-41, A144-45).

Plaintiff has therefore established only one adverse employment action taken against her: termination. Yet none of the events surrounding Plaintiff's termination suggest that her firing was motivated or impacted by racial bias, nor do they give rise to an inference that Plaintiff's termination was animated by intentional racial discrimination. It is not even clear from Plaintiff's Complaint or Answering Brief that Plaintiff alleges her termination was fueled by racial discrimination. (*See* D.I. 62 ¶ 62 (listing "Defendant's discriminatory acts" and not mentioning her termination); D.I. 71 at 13-14 (listing Plaintiff's purported evidence of racial discrimination and not mentioning her termination)).

Thus, Plaintiff has failed to make out a *prima facie* case of discrimination or disparate treatment based on race under Title VII or the DDEA.[17]

Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII and DDEA discrimination and disparate treatment claims based on race.

---

[17] Given this ruling, the Court has no reason to address Defendant's "*Faragher/Ellerth*" defense here.

b.      *Sex*

Plaintiff alleges that the following constitutes "direct evidence" of sex discrimination and disparate treatment:

- Affidavit statement of former Clayton Plant employee Kisha Dickson that "[Supervisor Greg Kirtley] tried to kiss my mouth, and I had to pull away to stop him." (D.I. 71 at 14; *see also* D.I. 71 Ex. A ¶ 7);

- Affidavit statement of former Clayton Plant employee Pamela Joseph that "Supervisors would let young women who they thought were attractive get away with anything, such as smoking marijuana in the parking lot or going to their cars to smoke." (D.I. 71 at 14; *see also* D.I. 71 Ex. B ¶ 6);

- The following exchanges during the deposition of former Clayton Plant employee Pamela Joseph:

  o Q. So [Greg Kirtley] flirted with you by telling you take your necklace off?
  A. It's the way he did it because he didn't have to touch me. He literally opened my shirt.  (D.I. 71 at 14; *see also* D.I. 78 at C51-52 (Joseph Deposition at 82:1 – 83:6)),

  o Q. Well, I'm asking you what you personally heard or saw.
  A. I'm telling you what I personally heard him say, Jaime [Dobies] say, "it's not who you know, it's who you blow." (D.I. 71 at 14 (citing Joseph Deposition at 211:14-18));

- The following exchange during Plaintiff's deposition (D.I. 71 at 15):

  o Q. So you thought that remark was aimed at trying to have a sexual relationship with you?
  A. Maybe not a sexual relationship. But why would you want a person to take their clothes off? I mean I don't know what his purpose was.  (D.I. 71 at 14; *see also* D.I. 71 Ex. J at 7-9 (Plaintiff Deposition at 73:2-8)).

Defendant responds by arguing that most of the allegations Plaintiff puts forward "do not relate to any conduct allegedly directed to [her]."  (D.I. 76 at 14).  Additionally, it asserts that the exchange from Plaintiff's deposition regarding a "sexual relationship" relates to a statement from Clayton Plant supervisor Greg Kirtley that "[Plaintiff] could go buck naked if that will help" when she requested a work smock and, therefore, the statement "does not show sex bias [or] constitute

29

a request for sexual favors," but was, at most, an isolated, stray remark that is insufficient to satisfy Plaintiff's claim. (D.I. 76 at 7). Lastly, Defendant points out that Plaintiff testified in her deposition that Jaime Dobies' statement, "it's not who you know, it's who you blow," was made in the summer of 2014 before Dobies became a supervisor, was not repeated once he became a supervisor, and thus is temporally remote from the decision to terminate Plaintiff. (*Id.*).

Much as with her race-based discrimination and disparate treatment claims, Plaintiff has not shown there is a genuine issue of material fact under the *Price Waterhouse* "mixed motive" standard for her Title VII and DDEA discrimination and disparate treatment claims based on sex. None of the actions in the record indicate that a decisionmaker placed substantial reliance on Plaintiff's sex when making a decision regarding the terms, conditions, disciplines, or privileges of her employment, because the one piece of evidence involving Plaintiff – the statement to her by Greg Kirtley that she could "go buck naked if that will help" – contains no indication of sex-based discrimination or animus. *See Walden*, 126 F.3d at 513-14. Moreover, even if it could reasonably be interpreted in such a fashion, the comment constitutes no more than a stray remark unrelated to a contested employment decision*, see, e.g.*, *Fakete*, 308 F.3d at 337-38 n.2, 339-40, and cannot fairly be said to directly reflect a sex-based reason for adverse employment action taken against Plaintiff, *Fakete*, 308 F.3d at 339.

Plaintiff has also failed to establish her sex-based discrimination and disparate treatment claims under *McDonnell Douglas* because she has not made out the necessary *prima facie* case. The elements of the *prima facie* case are the same as those for Plaintiff's race-based discrimination and disparate treatment claims – membership, qualification, adverse employment action, and circumstances that could give rise to an inference of intentional discrimination. *Mandel*, 706 F.3d at 167 (citations omitted). Defendant takes the same position on these claims as it does on

Plaintiff's race-based ones – it assumes Plaintiff can establish the first two elements, but argues she cannot satisfy the latter two because, in addition to its criticisms of her evidence (noted above), "she cannot identify any adverse employment action taken against her, nor can she establish a causal connection between the only adverse employment action in this case – [her] termination – and her membership in a protected category."[18] (D.I. 65 at 17-18).

As to adverse employment actions taken against her, Plaintiff alleges many of the same as for her race-based claims – that her pay was withheld, her medical information was disclosed, she was refused a list of open positions to which she was entitled, she was directed to sign grievances without a union representative present, she was subjected to unfair discipline, she was not promoted, and she was terminated. (D.I. 62 ¶ 63). Additionally, Plaintiff alleges that she and other female employees were subjected to repeated "sexual comments."[19] (*Id.*). As already discussed, however, of the overlapping alleged adverse employment actions, only Plaintiff's termination qualifies as such. *See supra.* The one additional alleged adverse employment action – that she and other female employees were subjected to repeated "sexual comments" – suffers from the same defects as the bulk of the others: to the extent that such actions occurred, Plaintiff has presented no evidence indicating that they caused a significant change in benefits. *See Sherrod*, 57 F. App'x at 75. Thus, Plaintiff is again left with one adverse employment action – termination.

---

[18] The Court again notes that Defendant's rebuttal that the alleged supervisor comments "do not relate to any conduct allegedly directed to Plaintiff" misapprehends the relevant question under *McDonnell Douglas*. *See supra* note 16.

[19] Plaintiff's allegation that employees were physically separated according to race does not relate to her sex-based claims; thus, the Court does not discuss it here.

Again, however, none of the events surrounding Plaintiff's termination give rise to an inference of a sex-based motive for that action or provide any other basis from which a reasonable factfinder could infer that her termination was motivated by intentional discrimination based on sex. The record is devoid of any indication that tangible employment actions were made on the basis of sex and, moreover, it is again unclear from Plaintiff's Complaint or Answering Brief that Plaintiff alleges her termination was animated by sexual discrimination. (*See* D.I. 62 ¶ 62 (listing "Defendant's discriminatory acts" and not mentioning her termination); D.I. 71 at 14-15 (listing Plaintiff's purported evidence of sex discrimination and not mentioning her termination)).

Thus, Plaintiff has failed to make out a *prima facie* case of discrimination or disparate treatment based on sex under Title VII or the DDEA.[20]

Accordingly, Defendant is entitled to summary judgment on Plaintiff's Title VII and DDEA discrimination and disparate treatment claims based on sex.

### 4. Hostile Work Environment Claims

Defendant also argues that Plaintiff's Title VII and DDEA hostile work environment claims "must be dismissed because [she] identifies nothing more than a series of isolated statements that are not discriminatory in nature, most of which were not reported to [Defendant] so they could be investigated and remediated" and the "one statement that was reported was immediately addressed and no further harassment is alleged to have occurred after remedial action was taken." (D.I. 65 at 1).

To address this aspect of the Motion, the Court must first resolve the discrepancy between these initial statements, Defendant's related substantive argument, and Plaintiff's actual claims. Defendant's initial statements are broad and appear to seek summary judgment on all of Plaintiff's

---

[20]    In light of this ruling, the Court need not address Defendant's alternative "*Faragher/Ellerth*" defense here.

hostile workplace claims. (*Id.*). Defendant's substantive argument, however, addresses only "racial and sexual harassment." (*See id.* at 18-20; D.I. 76 at 9-10 ("Argument V of Defendant's Opening Brief established that Plaintiff's hostile [work] environment claims based on race and sex fail . . . .)). Plaintiff's Complaint, on the third hand, asserts hostile workplace claims based on retaliation as well as race and sex discrimination. (D.I. 62 ¶ 66 (alleging, after listing Defendant's allegedly discriminatory and retaliatory conduct, that "Defendant's conduct was severe and pervasive, substantially altered the terms and conditions of [her] employment, and created a working environment so hostile that no reasonable employee would tolerate it," without limiting the allegation to any specific form of prohibited activity)).

Moreover, the Third Circuit allows hostile work environment claims under Title VII for all three forms of conduct, *see, e.g. Komis v. Sec'y of United Sates Dept. of Labor*, 918 F.3d 289 (3d Cir. 2019) (retaliation); *Mandel*, 706 F.3d at 167-70 (sex); *Caver v. City of Trenton*, 420 F.3d 243, 262-65 (3d Cir. 2005) (race), and courts are restricted from granting summary judgment *sua sponte* without giving notice to the potentially losing side and allowing them a reasonable time to respond. *Forrest v. Parry*, 930 F.3d 93, 110-11 (3d Cir. 2019) (citing Fed. R. Civ. P. 56(f); *Gibson v. Mayor & Council of City of Wilmington*, 355 F.3d 215, 222 (3d Cir. 2004)). Thus, the Court considers the Motion to extend only to Plaintiff's (i) racial and (ii) sexual hostile work environment claims, not her retaliatory hostile work environment claims.[21]

---

[21]    Additionally, in light of the fact that Plaintiff does not separately articulate the basis for her hostile workplace claims in her Answering Brief, the fact that the summary judgment standard favors Plaintiff, *see, e.g.*, *Reeves*, 530 U.S. at 150, and the close relationship between her discrimination and hostile workplace claims, the Court applies Plaintiff's asserted "direct evidence" of race and sex discrimination to the hostile work environment standards.

a. *Hostile Work Environment Based On Race*

To survive summary judgment on her hostile work environment claims, Plaintiff must establish: (a) she suffered intentional discrimination because of her membership in a protected class; (b) the discrimination was severe or pervasive; (c) the discrimination detrimentally affected her; (d) the discrimination would detrimentally affect a reasonable person in like circumstances; and (e) Defendant is liable for the discrimination she suffered under the doctrine of *respondeat superior*. *Mandel*, 706 F.3d at 167; *Jensen v. Potter*, 435 F.3d 444, 449 (3d Cir. 2006), overruled in part on other grounds by *Burlington N.*, 548 U.S. 53.

In determining whether Plaintiff has satisfied these requirements, the Court must consider the totality of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it reasonably interferes with [her] work performance." *In Re Tribune Media Co.*, 902 F.3d 384, 399 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 755 (1998).

Moreover, workplace harassment "is not automatically discrimination . . . [within the meaning of Title VII] merely because the words used have [certain] content or connotations"; "[t]he critical issue . . . is whether members of one [protected group] are exposed to disadvantageous terms or conditions of employment to which members of [another group] are not exposed." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80-81 (1998) (internal citations omitted). Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment." *Id.* Additionally, the last element – employer liability – "depends on whether the harasser is the victim's supervisor or merely a coworker." *Huston v. Procter &*

*Gamble Paper Prods.*, 568 F.3d 100, 104 (3d Cir. 2009) (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). If the harasser is merely a coworker, liability only attaches to the employer if that employer "failed to provide a reasonable avenue for complaint or, alternatively, if the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* at 104 (citations omitted). "Where the harasser is a supervisor *and* the victim suffered no tangible employment action, [however,] an employer is strictly liable" unless they can establish an affirmative defense. *Parkins*, 163 F.3d at 1032 (citing *Faragher*, 524 U.S. at 807); *see also Faragher*, 524 U.S. at 807-08.

Plaintiff offers two sets of evidence that support her racially hostile workplace claims: her EEOC charges and the deposition testimony and affidavits of four former coworkers. Collectively, they indicate that supervisors at the Clayton Plant "call[ed] black employees 'black' as a name," (D.I. 71 Ex. B ¶ 16), said "black people are 'lazy' and 'only play basketball,'" (*id.*), "g[a]ve black employees worse jobs," (*id.*), used racial slurs for African Americans, (D.I. 71 Ex. A ¶ 4, Ex. F at 2), and gave non-African American employees longer break times while shortening those of African American employees, (D.I. 72 Ex. H). *See supra*. Two former employees further indicated that general favoritism existed in the Clayton Plant against African Americans. (*Id.*; *see also* D.I. 71 Ex. F at 2; D.I. 78 C60 – C61 (Joseph Deposition at 229:21 – 230:2)). Based on this evidence, a reasonable jury could find that Plaintiff, alongside others, suffered intentional, pervasive racial discrimination, and, therefore, has satisfied the first two elements of a hostile work environment claim. Plaintiff's multiple EEOC charges on the topic, her call to Warehime regarding racial discrimination (evidenced in the January 2016 Charge), and her complaints to fellow employees satisfy the third element for summary judgment purposes, as they demonstrate that the discrimination had a detrimental impact on her. Additionally, the complaints of her fellow

employees, such as Valerie Savage and Fred Williamson, sufficiently suggest that the same discrimination would detrimentally impact a reasonable person in like circumstances. Finally, the EEOC charges and statements of Plaintiff's coworkers also sufficiently indicate that supervisors at the Clayton Plant, rather than fellow non-supervisory employees, perpetrated the discrimination. Based on this evidence, a reasonable jury could find that Defendant is strictly liable. Thus, Plaintiff has submitted sufficient evidence to establish a genuine issue of material fact regarding her hostile workplace claim based on race.

Defendant argues, however, that it is nevertheless entitled to summary judgment under the *Faragher/Ellerth* doctrine. Pursuant to that doctrine, summary judgment is appropriate notwithstanding the sufficiency of Plaintiff's evidence if no "tangible employment action" has been taken against Plaintiff, Defendant exercised reasonable care to prevent and promptly correct harassment, and Plaintiff unreasonably failed to take advantage of those preventative or corrective opportunities to otherwise avoid harm. *Faragher*, 524 U.S. 805; *Ellerth*, 524 U.S. 742; *see also Clegg v. Falcon Plastics, Inc.*, 174 F. App'x 18, 25-26 (3d Cir. 2006). Defendant argues that the doctrine is satisfied here because it addressed Plaintiff's complaints in 2015 when she pursued them internally and Plaintiff failed to take advantage of the same remedies for the alleged harms that underlie her instant hostile workplace claims based on race. (D.I. 65 at 20; D.I. 76 at 10). Plaintiff counters that "she filed multiple grievances, three discrimination charges, tape-recorded a phone call to H.R., and made several calls to the CEO"; "[m]ultiple witnesses established that H.R. and management would simply ignore discrimination complaints"; and "Defendant has no

documentation related to its actions following [her] complaint, and is unable to articulate any action it actually took." [22] (D.I. 72 at 23-24).

The Court agrees with Plaintiff and cannot say, as a matter of law, that Defendant prevails on this affirmative defense at this stage. *Faragher/Ellerth* requires, as noted, that Defendant establish that it exercised reasonable care to prevent and promptly correct harassment and that Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by Defendant to otherwise avoid harm. *E.g.*, *Faragher*, 524 U.S. 805. Reasonableness, however, "is a paradigm question of fact," *Clegg*, 174 F. App'x at 26, and material facts remain in dispute: although Defendant's representatives met with Plaintiff regarding several of her early complaints and took steps to address those complaints, the deposition testimony and affidavits Plaintiff has presented indicate that H.R. and management at the Clayton Plant frequently ignored complaints regarding race discrimination. In such an environment, it is not unreasonable that Plaintiff failed to take advantage of preventative or corrective opportunities provided by Defendant, as they had frequently failed for her coworkers who pursued issues similar to the one at hand.

Thus, Plaintiff has shown that genuine issues of material fact exist as to her Title VII and DDEA race-based hostile work environment claims and Defendant is not entitled to summary judgment on them.

---

[22] Plaintiff further argues that her termination and assignment to worse jobs constitute "discrete employment actions, as opposed to mere harassment" that – presumably – constitute "tangible employment action" and thereby short-circuit any *Faragher/Ellerth* defense. (D.I. 71 at 24-25). It is unclear whether a termination by another supervisor for reasons unrelated to the basis of a hostile workplace claim qualify as "tangible employment action" under *Faragher/Ellerth*; however, because the Court rules that Defendant has failed to satisfy the affirmative defense for other reasons, it does not address this issue.

b.  *Hostile Work Environment Based On Sex*

The same standards described for Plaintiff's hostile work environment claims based on race apply to her hostile work environment claims based on sex, *see, e.g.*, *Mandel*, 706 F.3d at 167 – she must establish that she suffered intentional discrimination as a result of her membership in a protected class that was severe or pervasive, detrimentally affected her, and would have detrimentally affected a reasonable person in like circumstances, and Defendant is liable for that discrimination. *Id.*

The relevant evidence Plaintiff has put forward, as described in relation to her sex-based discrimination and disparate treatment claims, does not indicate that she suffered intentional discrimination based on her sex. *See supra.* At most, it indicates that two other Clayton Plant employees were subjected to potentially harassing sexual conduct, not that she was subjected to such harassment or that a pattern of such conduct existed at the Clayton Plant. Similarly, the affidavit statement that attractive young female employees were allowed to "get away with anything" does not indicate that Plaintiff, who is also a female, was treated differently based on her sex. Finally, as already discussed, although the statement from Greg Kirtley to Defendant that she could "go buck naked if that will help" could be interpreted as connoting sex, it gives no indication that Plaintiff was exposed to "disadvantageous terms or conditions of employment to which members of the other sex are not." Thus, it cannot reasonably be interpreted as evidencing intentional discrimination that was pervasive or severe. *Oncale*, 523 U.S. at 80-81.

Accordingly, Plaintiff has not shown the existence of a genuine issue of material fact for her Title VII and DDEA sex-based hostile work environment claims, and Defendant is entitled to summary judgment on them.

## B.    __FMLA__

Finally, Defendant argues that it is entitled to summary judgment on Plaintiff's (1) FMLA interference claim and (2) FMLA retaliation claim, (D.I. 65 at 20-25), both of which are based on her alleged right to FMLA leave beyond December 19, 2017 and her alleged attempt to invoke that right,[23] (D.I. 62 ¶¶ 79-97).

### 1.    FMLA Interference Claim

To make out a claim of FMLA interference, Plaintiff must show: (a) she was "an eligible employee under the FMLA"; (b) Defendant "was an employer subject to the FMLA's requirements"; (c) she "was entitled to FMLA leave"; (d) she gave notice to Defendant of her intention to take or continue FMLA leave; and (e) she was "denied benefits to which [she] was entitled under the FMLA." *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014). Nevertheless, a claim for interference should be characterized as a retaliation claim if it is substantively identical to a retaliation claim, in that it speaks in terms of discrimination and/or retaliation and is premised on the allegation that the employer took adverse employment action against the employee because she requested or took FMLA leave. *Atchison v. Sears*, 666 F. Supp. 2d 477, 488 (E.D. Pa. Oct. 7, 2009); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004).

Defendant contends that Plaintiff's interference claim should be treated as a retaliation claim because "Plaintiff's explanation of her [interference] claim shows that it is in form and substance a retaliation claim." (D.I. 76 at 14). The Court disagrees. Plaintiff's Answering Brief lays out the requirements for both FMLA interference and retaliation. (D.I. 71 at 18-19). It then goes on to argue that Defendant failed to provide sufficient notice of the consequences of submitting proper paperwork, Defendant failed to be responsive to Plaintiff's questions regarding

---

[23]    It is undisputed that Plaintiff was entitled to FMLA leave up to December 19, 2017.

how paperwork should be submitted, and temporal proximity is sufficient to establish Defendant's retaliatory motive.[24] (D.I. 71 at 19-23). Although Plaintiff does not state which of these arguments relate to her retaliation claim versus her interference claim, the first two – notice and responsiveness – relate directly to at least the fourth element of an interference claim (notice) and have little bearing on a retaliation claim, for which Plaintiff must only show that she invoked her right to leave and suffered an adverse employment action causally related to that invocation, *Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 158-59 (3d Cir. 2015). Additionally, unlike her retaliation claim, Plaintiff's interference claim contains no mention of "termination," "retaliation," "discrimination," or like terms and concepts. (*Compare* D.I. 62 ¶¶ 79-86 *with* D.I. 62 ¶¶ 93-95). Thus, Plaintiff's FMLA interference claim is and will be treated as an interference claim.

As to the merits of Plaintiff's FMLA interference claim, Defendant does not contest the first two elements – that Plaintiff was an eligible employee under the FMLA or that it is an employer subject to the FMLA. (D.I. 65 at 21-24). The Court, therefore, only assesses whether genuine issues of material fact exist as to whether Plaintiff has sufficiently established the remaining three elements: that she was entitled to FMLA leave after December 19, 2017, gave notice to Defendant of her intent to continue her FMLA leave beyond that date, and was denied benefits to which she was entitled. *Ross*, 755 F.3d at 191-92.

First, genuine issues of material fact exist as to the entitlement element. Although her initial FMLA physician form "states that Plaintiff would not 'need to attend follow-up treatment appointments or work part-time or on a reduced schedule because of her medical conditions'" and

---

[24]     Plaintiff also argues that Defendant failed to properly request recertification of her leave (D.I. 71 at 20-22). It is unclear to the Court how that argument is relevant to these claims; thus, it does not consider it here.

that her condition "would not cause 'episodic flare-ups' preventing her from performing her job," (D.I. 65 at 21), that same FMLA physician form also states that the probable duration of Plaintiff's condition was "8-12 weeks" (which would indicate an ending date of January or February 2018), that Plaintiff was to "remain out of work until re-evaluated 12-19-2017," and that the "12-19-2017" "ending date" for her period of incapacity was simply an "estimate." (D.I. 67 at A63, A69-70). Additionally, after her re-evaluation, Plaintiff's physician completed another form stating that she should continue to abstain from work for at least another two weeks. (D.I. 72 Ex. K).

Genuine issues of material fact also exist regarding the notice element. The Third Circuit has explained that an employee is obligated "to provide sufficient information for an employer to reasonably determine whether the FMLA may apply to the leave request," but "need not provide every detail necessary for the employer to verify if the FMLA applies." *Lichtenstein v. UPMC*, 691 F.3d 294, 303-04 (3d Cir. 2012) (citations omitted). Rather, the "critical test" is "how the information conveyed to the employer is reasonably interpreted." *Id.* (citations omitted).

Here, Defendant did not receive Plaintiff's re-evaluation paperwork until January 10, 2018, twenty-one days after her initial leave expired and twelve days after Defendant terminated her employment. (D.I. 78 at C32-33). Plaintiff, however, argues that she left a voicemail with Defendant's H.R. department on December 22, 2017 "asking for the right fax number to send extension paperwork" and then spoke to Shivonne Urbano, her H.R. representative, on December 26, 2017 regarding the same issue. (D.I. 65 at 22-23). The content of the voicemail and call are disputed, but Plaintiff testified to her version of events in her deposition. (*See, e.g.*, D.I. 73 Ex. J at 14-15 (Plaintiff Deposition Transcript at 229:1-21)), and her termination letter, which references both the voicemail and the call, does not contradict it, (*See* D.I. 67 at A74). Additionally, as already noted, Plaintiff's initial FMLA physician form states that her condition

would likely persist for 8-12 weeks, that she would be re-evaluated four weeks later, on December 19, 2017, and that December 19, 2017 was only an "estimate" of the date by which she would be fit for work. (D.I. 67 at A63, A69-70). Thus, there is a genuine issue of material fact regarding the notice requirement.

Lastly, there is a genuine issue of material fact regarding the fifth element – that Plaintiff was denied benefits to which she was entitled. Plaintiff's termination is sufficient to evidence a denial of benefits at this stage.[25] *Lichtenstein*, 691 F.3d at 312.

Thus, Defendant is not entitled to summary judgment on Plaintiff's FMLA interference claim.

### 2.    FMLA Retaliation Claim

To state a claim for FMLA retaliation, Plaintiff must prove that: (a) "she invoked her right to leave"; (b) "she suffered an adverse employment decision"; and (c) "the adverse action was causally related to her invocation of rights." *Hansler*, 798 F.3d at 158-59. FMLA retaliation claims may be analyzed under the *McDonnell Douglas* burden-shifting framework described *supra*. *Ross*, 755 F. 3d at 193.[26] Thus, the first question is whether Plaintiff has made out a *prima*

---

[25]    The Court finds no need at this time to address Plaintiff's argument that Defendant's failure to provide notice constituted an interference with her right to FMLA leave. (D.I. 71 at 19-20). Her termination is sufficient.

[26]    It is unclear whether FMLA retaliation may also be established under *Price Waterhouse*'s "mixed motive" standard. *Compare Egan*, 851 F.3d at 275 ("[W]e hold that the DOL's use of a mixed-motive framework . . . is a permissible construction of the statute. Therefore, [the DOL's statute allowing a mixed-motive approach] is entitled to deference under *Chevron*, and a mixed-motive jury instruction is available for FMLA retaliation claims."), *with id.* at 282 ("Were we free to actually interpret the law rather than merely defer to an executive agency, we might well conclude that the FMLA does not allow for a mixed-motive instruction for [this] retaliation claim." (Jordan, J., concurring)). Because these claims survive summary judgment under *McDonnell Douglas*, however, the Court need not address the question here.

*facie* case of FMLA retaliation; the second is whether Defendant has set forth a legitimate, non-discriminatory reason for the termination; and the third is whether Plaintiff can establish that Defendant's asserted reason is pretextual. *Id.* As already discussed *supra* regarding Plaintiff's Title VII and DDEA retaliation claims, however, both Defendant's reason for terminating Plaintiff – her failure "to return to work or submit additional medical documentation extending her leave beyond its expiration," (D.I. 65 at 24) – and Plaintiff's pretext evidence are sufficient for those respective steps at this stage. Thus, the only question is whether Plaintiff has made out a sufficient *prima facie* case of FMLA retaliation to avoid summary judgment.

She has. As already explained *supra* regarding her FMLA interference claim, Plaintiff has presented evidence indicating that she had a right to FMLA leave after December 19, 2017 and invoked that right. Additionally, termination is an "adverse employment decision," *Leboon*, 503 F.3d at 232 & n.9, and the temporal proximity between Plaintiff's notice of her intent to continue her FMLA leave and her subsequent termination – six days – constitutes "unusually suggestive" timing that is sufficient to evidence a causal relationship between the two at this stage, *see, e.g., Lichtenstein*, 691 F.3d at 307 (six days deemed sufficient); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (two days deemed sufficient).

Thus, Defendant is not entitled to summary judgment on Plaintiff's FMLA retaliation claim.

## IV.  CONCLUSION

In light of the foregoing, Defendant is entitled to summary judgment on Plaintiff's discrimination and disparate treatment claims based on race and sex, and Plaintiff's hostile work environment claims based on sex. It is not entitled to summary judgment on any of Plaintiff's

other claims.  Defendant's Motion for Summary Judgment is therefore GRANTED-IN-PART and

DENIED-IN-PART.

An appropriate order will be entered.